## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| TERRENCE MIKLOS | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 01-cv-0303 |
| | ) | |
| ANTHONY J. PRINCIPI, Secretary | ) | |
| Department of Veterans Affairs | ) | |
| | ) | |
| Defendant | ) | |

## OPINION AND ORDER

Pending before the Court is Defendant Anthony J. Principi's Motion for Summary Judgment (Doc. #45). Plaintiff, Terrence Miklos, has alleged that: (1) he was discriminated against because of his gender when he was removed as Supervisor of Manual Arts Therapists at the Butler VA Medical Center ("the Butler VA") and a female recreational therapist was made acting supervisor and assumed Plaintiff's prior duties; and (2) Defendant retaliated against Plaintiff for filing a complaint of discrimination. For the reasons set forth below, Defendant's motion for summary judgment is denied as to Plaintiff's gender discrimination claim and is granted as to Plaintiff's retaliation claim.

### I. Standard of Review.

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, fail to demonstrate a genuine issue of material fact and thus, the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In other words, summary judgment may be granted only if there exists no genuine issue of material fact that would permit a reasonable jury to find for the

nonmoving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250, 106 S.Ct. 2505 (1986).

The moving party may meet its burden on summary judgment by showing that the nonmoving party's evidence is insufficient to carry the burden of persuasion at trial.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S.Ct 2548 (1986).  The nonmoving party must then go beyond the pleadings and, by affidavits, depositions, answers to interrogatories, and admissions on file, designate facts showing that a genuine issue of material fact remains for trial.  Id. at 324. In deciding a motion for summary judgment, the facts must be viewed in a light most favorable to the nonmoving party and all inferences must be drawn in that party's favor." Gray v. York Newspapers, Inc., 957 F.2d 1070, 1078 (3d Cir. 1992).

## II. Statement of Relevant Facts.

Viewing the evidence of record in a light most favorable to Plaintiff, as the non-moving party, following is a recitation of the evidence relevant to the instant motion for summary judgment.

Plaintiff graduated from college with an industrial arts education degree. Plaintiff's deposition, p. 25.  Plaintiff was hired at the Butler VA as a vocational rehabilitation therapist, a GS-10 position, in 1981. Sumansky Declaration, ¶ 9. At some point, Plaintiff's job title was changed to Manual Arts Therapist ("MAT"). Plaintiff's deposition, p. 19.  In 1992, Plaintiff was promoted to supervisory MAT, a GS-11 position. Plaintiff's deposition, p. 12. Plaintiff was a GS-11 supervisory MAT from 1992 until 2000. Plaintiff's deposition, p.12. Throughout his career, Plaintiff has received favorable performance evaluations. Plaintiff's deposition, p. 61.

In or about 1998, there was a merger of departments at the Butler VA and the manual arts therapists and the recreational therapists ("RTs") merged into one "Recreation Therapy" group. Plaintiff's deposition, p. 12.  At the time of the merger, there were 3 male MATS, Plaintiff,

Williams Kunst ("Kunst") and Mark Cadamore ("Cadamore"), and 2 female RTs, Barbara Taylor ("Taylor") and Mary Ann Capuzzi ("Capuzzi"). Plaintiff's deposition, pp. 11 and 25. The Business Manager of the new Recreation Therapy Department was Larry Sumansky ("Sumansky"). Sumansky Declaration, ¶ 2.

At the Butler VA, RTs are required to be certified annually. Sumansky Declaration, ¶ 55. Additionally, at the Butler VA, a certified RT performs a purely clinical function; an RT's primary responsibilities include the planning and implementation of therapeutic activities for patients of the Butler VA. An RT assesses patient needs, identifies and plans recreation therapy activities appropriate to individual patient needs, and establishes a plan of recreation therapy activities which may be carried out by others, not necessarily a certified RT. Sumansky Declaration, ¶ 53. An RT performs patient assessments, from which a plan is developed for recreation therapy activities appropriate to individual patient needs. Every patient admitted to the Butler VA is required to undergo a patient assessment. An RT at the Butler VA spends approximately 50% of their time performing patient assessments. Sumansky Declaration, ¶ 54.

At the Butler VA, a MAT is responsible for performing trade or technically based duties to assist with the "hands on" vocational needs of a patient. Sumansky Declaration, ¶ 56.  A MAT promotes mental and physical well-being through simulated work activities. Plaintiff's deposition, p. 18. These activities have included wood working, sheet metal working and mechanical skills that may be used in a trade or craft activities. Id. In the past, MATs did provide some vocational rehabilitation.  Id.  The activities engaged in by a MAT with a patient are those deemed appropriate by an RT or a physician. Id.; Plaintiff's deposition, p. 18.

Once the MATs and RTs merged into the Recreation Therapy department, a number of the duties that the MATs had performed prior to the merger were reduced. Plaintiff's deposition,

3

p. 19. For example, prior to the merger, the MATs did assessments on patients, made notes, and attended treatment team and Joint Commission on Accreditation of Hospital ("JCAHO") meetings; after the merger these responsibilities were given to the RTs. Plaintiff's deposition, pp. 23, 38-39, and 102. Additionally, while prior to the merger Plaintiff, as the supervisory MAT, was in charge of planning MAT-organized patient activities, scheduling the MATs, doing the MATs' budget and ordering their supplies, approving MATs' leave and training requests, and dealing with volunteers for MAT-organized patient activities, after the merger, those responsibilities for the entire Recreation Therapy group were given to Taylor. Plaintiff's deposition, pp. 13-14, and 50. Further, after the merger Taylor was assigned the pager for the Recreation Therapy group and became the contact person for the group. Plaintiff's deposition, pp. 42, 177, 178 and 235; Kunst deposition, p. 23. Plaintiff also had his corporate credit card taken away from him. Plaintiff's deposition, p. 42. Finally, since the merger, Taylor has given both Plaintiff and Kunst orders on programming, how to direct the patients and how to "set them up." Plaintiff's deposition, p. 55; Kunst deposition, p. 96.

Prior to the merger, Taylor had been in possession of the purchase cards for her department. Taylor deposition, pp. 31-32. Also prior to the merger, Taylor had attended Commission on Accreditation of Health Care Organization and Joint Commission on Accreditation of Health Care Organization meetings. Sumansky Declaration, ¶ 11.

Kathleen Zeiler ("Zeiler") became Program Manager for the Butler VA in or about August 1999. Plaintiff's deposition, pp. 10, 32. Zeiler is Sumansky's supervisor. Zeiler treated the MATS and RTs differently. Shortly after her arrival at the Butler VA, Zeiler gave Taylor and Capuzzi an office right next to hers. Plaintiff's deposition, p. 41. The MATs office was placed in the basement. Plaintiff's deposition, p. 41. Additionally, Taylor and Capuzzi could get training

4

whenever they wanted, Taylor and Capuzzi did not have to have permission to take leave, and Taylor and Capuzzi did not have to cover for each other if they were not going to be able to cover their job responsibilities, i.e. they could take off at the same time. Plaintiff's deposition, pp. 41 and 258. If Plaintiff or Kunst wanted to take time off, they had to have coverage for their groups and they were not allowed to take off on the same day. Plaintiff's deposition, p. 258. The MATs also had to find coverage for their job responsibilities if they wanted to attend training. Plaintiff's deposition, p. 41. Taylor and Capuzzi were allowed to dress differently from how the MATs were allowed to dress. Plaintiff's deposition, p. 41. Both the MATs and RTs were fitted for uniforms but only the men ultimately wore the uniforms. Plaintiff's deposition, pp. 41-42. Finally, Plaintiff and Kunst were not allowed to accumulate comp time or overtime but Taylor used comp time. Plaintiff's deposition, p. 263.

Plaintiff tried to meet with Zeiler beginning in 1999, and into 2000, to discuss the various changes in his position, as well as Taylor taking over his responsibilities, but Zeiler always cancelled their meetings. Plaintiff's deposition, pp. 37, 151. Taylor told Plaintiff in one e-mail that "[m]eeting with you would be fruitless." Plaintiff's deposition, p. 150.

In April 2000, Plaintiff was downgraded from a supervisory MAT to a MAT. Plaintiff's deposition, pp. 26-27. The downgrade was ordered once Sumansky told Zeiler that Plaintiff was only supervising one MAT and Zeiler asked Human Resources to conduct a position classification review; they reported that Plaintiff was not meeting the requirements to be classified as a supervisory MAT. Sumansky Declaration, ¶¶ 31-32. As a result of this downgrade, Plaintiff went from being a GS-11, step 8, to a GS-10, step 10. Plaintiff's deposition, p. 57.

Although downgraded from a GS-11 to a GS-10, Plaintiff was placed on grade retention for a period of two (2) years. Stanley Pakutz Declaration, ¶ 24. Thus, Plainitff retained his GS-11

5

status for two years. Id. Additionally, Plaintiff was provided indefinite pay retention. Id. at ¶ 26. While on pay retention status, Miklos receives all of the locality pay and 50% of each cost of living allowance for the rate of retained garde/step, not to exceed 150% of the maximum rate of pay. Id.

Sumansky announced sometime after Plaintiff's downgrade, around May 2000, that Taylor was the leader of the recreation therapy group, but Taylor actually started to take over this position in August 1999. Plaintiff's deposition, pp. 11-12; Kunst deposition, p. 23.

Sumansky has final signatory authority for the publication of Plaintiff's work schedule. Sumansky Declaration, ¶ 12. Sumansky has asked Taylor to prepare a draft of the patient activities and incorporate all requests for leave and training for his review. Id. In the instance of a disproportionate number of weekend or night shifts assigned to the staff, including Miklos, Sumansky would correct the schedule prior to issuance to employees in order for an equitable weekend or night shifts. Id. Sumansky also is the approving official for Plaintiff's requests for sick and annual leave. Id. at ¶ 13. Plaintiff has requested leave from Sumansky directly and he has also included leave requests as part of the data collection and schedule drafting performed by Taylor. Id.; Plaintiff's deposition, p. 236 Sumansky performs Plaintiff's annual reviews. Id. at ¶ 17.

Plaintiff's opinion is that Sumansky does what he is told to do by Zeiler and Taylor. Plaintiff's deposition, p. 236.

In May, 2000, immediately after Plaintiff was downgraded, Zeiler requested from human resources that a position of supervisor of the recreation therapy group be created. Plaintiff's deposition, p. 27. Her request was denied multiple times. Plaintiff's deposition, pp. 28, 35. Zeiler also tried unsuccessfully to have the MATs downgraded from therapists to aides.

Plaintiff's deposition, p. 159; Kunst deposition, p. 30.

In May 2000, Plaintiff filed an informal grievance with Zeiler, stating that he was treated unfairly when he was downgraded from a GS-11 supervisory MAT to a GS-10 MAT. Plaintiff's deposition, pp. 34-35. He wrote on a piece of paper that it was a grievance. Plaintiff's deposition, p. 34. In June 2000, Plaintiff filed a formal complaint. Plaintiff's deposition, p. 36. Plaintiff also filed a formal complaint about Zeiler's husband, a volunteer at the Butler VA, being in Plaintiff's work area. Plaintiff's deposition, p. 113.

On July 5, 2002, Sumansky made Taylor "acting supervisor" for one day. Sumansky Declaration, ¶ 20. On that date, Taylor filled out a "report of contact" on Plaintiff. Specifically, Taylor reported that Plaintiff was not where he was supposed to be at a certain time. Plaintiff's deposition, p. 79. Plaintiff was not admonished in any way as a result of this report. Id. Taylor submitted other "reports of contact" on Plaintiff. Id.

In the last 10 plus years, the patient population at the Butler VA has changed significantly. Sumansky Declaration, ¶ 60. The patient population is between 65 and 95 years in age, with chronic, multiple medical conditions, issues of instability, and issues of cognitive impairments. Id. This shift has resulted in a shift from provision of hospital services to provision of long-term care services such as found in a nursing home. Id. This shift places a greater demand on the skills offered by an RT, which focus on rehabilitation activities, and de-emphasizes the skills offered by MATs, which focus on diversionary activities. Id. at ¶ 62. A consequence of this shift is the need to have RTs involved in meetings, such as CARF and JCAHO meetings, rather than a MAT. Id. at ¶ 63.

Concerning patient assessments, at some point after the merger, the issue of whether MATs could perform initial patient assessment was raised and Kunst, Plaintiff and Sumansky

were told by the joint commission in Chicago, via a phone call, that MATs could perform initial

assessments and that the assessments did not have to be done by an RT. Kunst deposition, p. 114.

## III. Legal Analysis.

## A. Plaintiff's gender discrimination claim.

Plaintiff has alleged that "he was discriminated against because of his gender when he

was removed as Supervisor of Manual Arts Therapists (MATs) and a female, recreational

therapist was made acting supervisor, assuming Plaintiff's prior duties." Plaintiff's Brief in

Opposition to Defendant's Motion for Summary Judgment ("Plaintiff's Opposition Brief"), p. 1.

Defendant argues that Plaintiff's claim of gender discrimination fails because "he cannot

establish a *prima facie* case on his allegation of disparate position change, and in any event, the

VA has a legitimate, nondiscriminatory reason for the position change [a reason that Miklos

cannot expose as pretext]." Memorandum of Law in Support of Defendant's Motion for

Summary Judgment ("Defendant's Supporting Brief"), pp. 1 and 12.

## 1. Whether Plaintiff has established his prima facie case of gender-based discrimination.

Concerning Plaintiff's *prima facie* case, Defendant argues that Plaintiff "was not

qualified for the position of Supervisory MAT; he did not suffer an adverse employment action;

and non-members of the protected class were not treated more favorably." Id. at p. 12. "Title VII

prohibit[s] an employer from engaging in race or gender discrimination against an employee.

Under the oft cited decision in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817,

36 L.Ed.2d 668 (1973), [the plaintiff] must first establish a *prima facie* case of discrimination.

To do so []he must offer sufficient evidence that []he was: (1) a member of the protected class,

(2) qualified for the position []he sought, and (3) nonmembers of the protected class were treated

more favorably. Goosby v. Johnson and Johnson Medical, Inc., 228 F3d 313 (3rd Cir. 2000),

8

citing, Ezold v. Wolf, Block, Schorr and Solis Cohen, 983 F.2d 509, 522 (3d Cir.1993).

### a. Whether Miklos was qualified for the Position of Supervisory MAT.

Defendant's position is that Plaintiff was not qualified for the position of Supervisory

MAT because this position required the supervision of at least three MATs and at the time of his

downgrade, he was supervising only one MAT, William Kunst. Defendant's Supporting Brief, p.

14. In response, Plaintiff argues first that he was qualified for the Supervisory MAT position at

the time of his downgrade because the requirement that he supervise three MATs was not

considered by Defendant to be an essential function of the Supervisory MAT position. In support

thereof, Plaintiff points to the undisputed evidence that he had not had three MATs under his

supervision since 1993 when Clark transferred out of the Butler VA facility and it was not until

April 2000, after Zeiler came on board at the Butler VA, that he was demoted. Plaintiff's

Opposition Brief, pp. 13-14. Plaintiff also argues that because the MATs had merged with the

RTs in 1997 and MATs and RTs are functionally equivalent at the Butler VA, there were three

subordinate employees, 1 MAT and 2 RTs, in the department at the time of his downgrade that

he could have supervised. Plaintiff's Opposition Brief, p. 14. "In short, the Defendant had not

enforced the requirement of three subordinate employees for nearly seven years, and, at the time

that Plaintiff was demoted the merged department had sufficient employees at the appropriate

grade." Id. at 15.

"We determine a plaintiff's qualifications for purposes of proving a *prima facie* case by

an objective standard." Weldon v. Kraft, Inc., 896 F.2d 793, 798 (3d Cir.1990); Jalil v. Avdel

Corp., 873 F.2d 701, 707 (3d Cir.1989), cert. denied, 493 U.S. 1023, 110 S.Ct. 725, 107 L.Ed.2d

745 (1990). Under the category "principal duties and responsibilities" of the "supervisory

manual arts therapist" it is stated that "[t]he primary duty of this position is to personally direct

9

the administration, planning and organization of all activities within the Manual Arts Therapy program by means of advanced technical skills as well as the supervision of two staff therapists and a Therapy Assistant. The latter position is that of a training staff therapist." On the basis of this description, Defendant contends that summary judgment must be granted in its favor since as of 1993, Plaintiff was not supervising 3 MATs. Yet, Plaintiff had not supervised the requisite number of staff since 1993 and Defendant did not seek to change Plaintiff's position from Supervisory MAT to MAT until 1999. The Court finds that Defendant cannot now defeat Plaintiff's claim by arguing that Plaintiff was not fulfilling a requirement of the supervisory MAT position when Defendant itself did not enforce the requirement for more than six (6) years and Plaintiff's performance evaluations otherwise indicate that Defendant was pleased with Plaintiff's job performance. For purposes of his *prima facie* case, Plaintiff has satisfied his burden of showing that he was qualified for the position of Supervisory MAT.

### b. Whether Miklos suffered an adverse employment action.

Defendant next argues that Plaintiff did not sustain an adverse employment action. Defendant's Supporting Brief, p. 15. Specifically, Defendant argues:

> "[w]hile Miklos' official position changed as of April 23, 2002, he remained a GS-11. His salary, benefits, tour, and scheduled days remained the same." Miklos' responsibilities and duties have remained the same, because he had not been fulfilling the responsibilities of a Supervisory MAT since June 12, 1993 when Clark transferred to Highland Drive. In the same vein, the VA did not alter its assignments to Miklos after his position change, nor has it assigned him work that is any different from any other employee holding the title of MAT because he had not fulfilled the responsibilities of a Supervisory MAT since June 12, 1993. He has not been demoted and nothing negative has been placed in his personnel file."

Id. at pp. 15-16 (citations to record omitted).

In response, Plaintiff argues:

First, Plaintiff did not remain a GS-11 as stated by the Defendant. Rather, in April, 2000, Plaintiff was informed that he was being downgraded from Supervisory MAT to MAT. As a result of this demotion, Plaintiff was reduced from a GS-11, step 8, to a GS-10, step 10. The economic impact of this reduction in grade is that Plaintiff will only receive half of the cost of living raises until his rate of pay is on par with his grade and step, and as Plaintiff is now at the top step of his current grade, he can no longer receive salary increases based on time in service and performance.

While it is true that, under grade retention, the change in grade was not made effective until 2002, that change became inevitable at the time the decision was made in April, 2000. . . .

Finally, the Defendant argues that Plaintiff's responsibilities did not change as he had not performed the duties of supervisory MAT since 1993, the time he ceased supervising three MATS. First, as previously discussed, the Defendant obviously did not consider the number of employees supervised an essential function of Plaintiff's position as he continued to hold the position and received excellent performance evaluations in that position, until April, 2000. Second, the Defendant's argument makes the presumption that supervising three MATs was the only function of the supervisory MAT position. Contrary to this argument, as MAT supervisor, Plaintiff planned patient activities, managed the scheduling for the MATS working under his supervision, ordered supplies, and attended various management level meetings, such as transitional care meetings. Plaintiff also received numerous hours of supervisory training and acted as coordinator of physical medicine. As set forth fully in that statement of facts, these duties continued until they were reassigned to Ms. Taylor.

In short, as a result of the change from supervisory MAT to MAT, Plaintiff suffered economic harm in the form of loss of half of his cost of living raises, received a reduction in grade, lost all of his supervisory duties, and was given a less prestigious title.

Id. at pp. 17-18.

The Third Circuit court has defined "an adverse employment action" under Title VII as an action by an employer "which is 'serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment'." Cardenas v. Massey, 269 F.3d 251, 263 (3d Cir.2001), quoting, *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1300 (3d

Cir.1997)). See also Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 761, 118 S.Ct. 2257 (1998) (concluding that an adverse employment action encompasses all tangible employment actions such as "hiring, firing, failing to promote, reassignment with significantly different responsibilities or a decision causing a significant change in benefits.") .

Plaintiff testified that beginning in August 1999, Taylor took over performing the following duties and responsibilities that previously Plaintiff had performed for his MAT group in his role as the supervisory MAT: "[s]he was responsible for planning patient activities for the group. She was responsible for scheduling the employees. She went to all of the [transitional care] meetings with Zeiler and Anita;" "[s]he was approving leave, [and] training; and "[s]he was responsible for dealing with volunteers." Plaintiff's deposition, pp. 13-14. See also Id. at p. 339 (Plaintiff testified that Taylor took over the following activities that he had previously performed "ordering supplies, scheduling activities, scheduling staff schedules, attending meetings"). This testimony is supported by the deposition testimony of co-worker William Kunst. See Kunst deposition, p. 22 ("[Taylor] was instructed by Larry [Sumansky] that she was to do the planning and the scheduling and the budget. . . . We were told that [by Sumansky].") The Court finds that these changes in Plaintiff's duties and responsibilities constitute an adverse employment action being taken against Plaintiff. Additionally, we find that the change in Plaintiff's position from Supervisory MAT to MAT constituted an adverse employment action in that as a result of this change, there was an alteration of Plaintiff's compensation and/or his terms of employment. Specifically, as a result of this change, after two years Plaintiff would be (and presumably now has been) downgraded from a GS-11, step 8, to a GS-10, step 10, which has an economic impact upon Plaintiff in that he now only receives one-half of any cost-of-living increases received by those in that grade and step. Further, Plaintiff has been denied future

12

economic opportunities since once a federal employee reaches step 10 of any grade, the employee no longer has the opportunity for salary increases based on time in service and performance. See Simmerman v. Hardee's Food Systems, Inc. 1996 WL 131948, *14 (March 22, 1996 E.D. Pa.) (stating in context of an ADA retaliation claim that "[a]lthough there is no exhaustive list of what constitutes adverse employment action, examples include demotion, additional responsibilities, termination, denial of a deserved promotion, pay decrease, or loss of benefits").

### c. Whether nonmembers of the protected class were treated more favorably.

Defendant next argues that Plaintiff cannot establish that it treated a similarly situated female more favorably because "Miklos' allegations of improper favorable treatment toward Taylor based on gender lack any solid factual foundation and instead, the crux of his explanation for the VA's actions is nothing more than that the VA must have acted with gender-based animus simply because he is a male and Taylor is a female." Defendant's Supporting Brief, p. 17. In support thereof, Defendant further argues: (1) "[a] review of Taylor's OPF reveals that Taylor has had no new duties assigned to her;" (2) Taylor's "OPF [official personnel folder] reveals no formal appointment as a team leader (or other similar title, such as supervisor) since Miklos' position change, nor has any informal appointment of this nature transpired;" and (3) the Supervisory MAT position still exists and has not been filled. Id.

In response, Plaintiff argues:

> there is abundant evidence that Ms. Taylor did take over Plaintiff's supervisory duties and performed those duties for the entire merged department. (Miklos Dep. Pp. 11-12, 339). Specifically, Ms. Taylor, who had no prior experience as a supervisor, took over planning patient activities for the entire group, preparing staff schedules, ordering supplies, and attending transitional care, leadership, and extended care meetings. Note that in the cited portions of her deposition transcript, Ms. Taylor states unequivocally that she does perform those duties.

13

In addition, after the departments merged, Plaintiff's participation in with the Joint Commission on Accreditation of Hospitals (JCAHO) was essentially eliminated, with Ms. Taylor and Ms. Capuzzi taking over this area for the merged department. Both Plaintiff and Mr. Kunst noted that Ms. Taylor gave them orders pertaining to the manner in which their duties are performed.

Both Plaintiff and Mr. Kunst stated that they believe that Ms. Taylor is their immediate supervisor, even now. While both admit that Mr. Sumansky is technically their immediate supervisor, he has minimal involvement with the department and Plaintiff only sees him a few times a year.

There are also a large number of e-mails showing that Ms. Taylor managed employee schedules, controlled the department budget, criticized Plaintiff's performance and referred to herself as acting supervisor. Contrary to the Defendant's statements, the Plaintiff did go over a number of specific e-mails during his deposition.

Ms. Taylor was also assigned the pager and credit card for recreation therapy.

Plaintiff also stated that it is obvious that, although his performance evaluations are signed by Larry Sumansky, Ms. Taylor had input due to the facts that various items that were known only to her have appeared in his evaluations and Mr. Sumansky does not observe him performing his duties.

With respect to the Defendant's argument that Mr. Sumansky does the final approval of the schedules, it should be noted that while Mr. Sumansky does initial current schedules, he did not start doing this until January, 2001.

By his actions, Mr. Sumansky also considers Ms. Taylor to be the supervisor of recreational therapy. Specifically, when Plaintiff made a training request to Mr. Sumansky, he referred it to Ms. Taylor. In addition, after Plaintiff's demotion, Larry Sumansky announced that Ms. Taylor was the acting supervisor of recreational therapy, and would be in charge of the budget as well as scheduling and planning, and issued an organizational chart that showed Ms. Taylor over the MATs. Apparently, this was merely confirming the situation, as in a memorandum dated February 8, 2000, Mr. Pakutz notes that Ms. Taylor was designated work leader in recreation therapy, a designation that could presumably only be made by Mr. Sumansky or Ms. Zeiler. This memorandum also notes that a review of her new duties would need to be performed to determine if it was necessary to increase her grade.

Plaintiff's Opposition Brief, pp. 18-21.

Given the deposition testimony of both Plaintiff and Mr. Kunst that some time after August 1999 and prior to May 2000, Ms. Taylor began to perform duties and assume responsibilities that Plaintiff had previously performed, we find that Plaintiff has provided sufficient evidence on the issue of whether nonmembers of the protected class were treated more favorably to deny Defendant's motion for summary judgment on this basis.

## 2. Whether Miklos has demonstrated pretext.

Once a plaintiff establishes a *prima facie* case, the burden of production shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the action taken by the defendant. <u>McDonnell Douglas</u>, 411 U.S. at 802. "The employer satisfies this burden by introducing evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision." <u>Fuentes v. Perskie</u>, 32 F.3d 759, 763 (3d Cir. 1994). If the defendant satisfies this burden, then the plaintiff must show that the employer's explanation is pretextual. <u>Id</u>. Elaborating on this last factor, the Third Circuit court has explained:

> to defeat summary judgment when the defendant answers the plaintiff's prima facie case with legitimate, non-discriminatory reasons for its action, the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action. In other words, because the factfinder may infer from the combination of the plaintiff's prima facie case and its own rejection of the employer's proffered non-discriminatory reasons that the employer unlawfully discriminated against the plaintiff and was merely trying to conceal its illegal act with the articulated reasons, a plaintiff who has made out a prima facie case may defeat a motion for summary judgment by *either* (I) discrediting the proffered reasons, either circumstantially or directly, or (ii) adducing evidence, whether circumstantial or direct, that discrimination was more likely than not a motivating or determinative cause of the adverse employment action. Thus, if the plaintiff has pointed to evidence sufficiently to discredit the defendant's proffered reasons, to survive summary judgment the plaintiff need not also come forward with additional

15

evidence of discrimination beyond his other prima facie case.

> To discredit the employer's proffered reason, however, the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent. Rather, the non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them "unworthy" of credence," and hence infer "that the employer did not act for [the asserted] non-discriminatory reasons."

Id. at 764 (citations and quotations omitted).

Here Defendant articulates its alleged legitimate, nondiscriminatory reasons for changing Miklos's position as follows. First, "as of August, 1999, Miklos no longer met the qualifications of a Supervisory MAT because, by that date, he supervised only one MAT, Kunst. Due to the departures of Clark and Cadamore, and pursuant to HRML Letter No. 05-95-7, the VA was required to change Miklos' position." Defendant's Supporting Brief, p. 21. Second, "[t]o the extent that the Court is persuaded that Taylor has assumed some type of supervisory role over the MATs and RTs, the VA had a legitimate, nondiscriminatory reason for its actions. Specifically, the positions of MAT and RT differ fundamentally, and given the shift in the make-up of the patient population at the Butler VA, the differences between the two have become even more significant." Id. at p. 22.

In response to Defendant's contention that it changed Miklos's position from Supervisory MAT to MAT because he was not longer supervising the requisite number of MATs, Plaintiff argues: (1) "Plaintiff had not had three MATs under his supervision since 1993 and yet had not only continued to hold the position but had received outstanding performance evaluations. [T]his indicates that the Defendant did not consider this to be an essential function of the position;" (2) as a result of the 1997 merger, there were 2 RTs and 1 MAT in the department for

16

Plaintiff to supervise; (3) Ms. Zeiler made the request to have Plaintiff's Supervisory MAT

position reviewed and Plaintiff downgraded and then, one month after Plaintiff was downgraded,

she made a request to have a supervisory position for recreation therapy created; and (4) "[i]t

seems improbable that the Defendant would just happen to decide to downgrade Plaintiff shortly

after his duties had already been stripped away and assigned to a female employee.

In response to Defendant's contention that the jobs of RT and MAT differ fundamentally,

Plaintiff argues:

> there is record evidence that MATs and RTs are functionally equivalent at the
> Butler VA. (Miklos Dep. Pp. 48-50, 271-272, 345; Kunst Dep. Pp. 98, 111-114).
> In fact, following the merger, the MATs often performed RT activities, although
> the RTs didn't reciprocate (Cadamore Dep. pp. 60-62). Furthermore, although the
> Defendant asserts the RTs are different because their services are reimbursable by
> insurance, both Plaintiff and Mr. Kunst, who attended a seminar on the subject,
> stated that both groups can technically be billed for insurance purposes, but that
> insurance reimbursement isn't received for any of the activities at the recreation
> department of the Butler VA (Miklos Dep. Pp. 345-46); Kunst Dep. pp. 111-114).
> Finally, the primary supervisory duties at Plaintiff's level were scheduling,
> ordering supplies, budgeting and attending meetings. There is absolutely no
> argument that can be made that an individual with eight years of supervisory
> experience and substantial supervisory training couldn't perform these basic
> managerial tasks for individuals outside his specific job title, especially when RTs
> and MATs are functionally equivalent.  After all, neither Mr. Sumansky nor Ms.
> Zeiler are RTs and yet they occupied supervisory positions over the RTs and Ms.
> Taylor is not a MAT and yet performs these duties currently with respect to the
> MATs.

Id. at p. 24-25.

Finally, Plaintiff argues that there is evidence that Ms. Zeiler was motivated by gender

bias:

> [s]hortly after Ms. Zeiler's arrival. Ms. Taylor and Ms. Capuzzi were assigned an
> office adjacent to Ms. Zeiler's and enjoyed an open door policy with Ms. Zeiler.
> (Miklos Dep. Pp. 41).  In contrast, Plaintiff and the other MATs were assigned an
> office in the basement, and, on several occasions when Plaintiff requested a
> meeting with Ms. Zeiler, the meetings were canceled and Ms. Zeiler did not return
> Plaintiff's calls to reschedule. (Miklos Dep. Pp. 37, 41). In addition, under Ms.

Zeiler, Ms. Taylor and Ms. Capuzzi were not required to wear uniforms, despite being fitted for same, while Plaintiff and the other MATs were; Ms. Taylor and Ms. Capuzzi were permitted to take days off without arranging coverage for their activities whereas Plaintiff and the other MATS had to arrange for their activities to be covered before leave could be approved; and Ms. Taylor and Ms. Capuzzi were permitted to accumulate comp time while Plaintiff and the other MAT(s) were not (Miklos Dep. pp. 41-45, 258-264; Kunst Dep. pp. 43-45, 77-78).

Id. at pp. 25-26.

Viewing the evidence in the record in a light most favorable to Plaintiff, there is evidence in the record from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.  For example, Defendant's position is that because RTs and MATs are functionally different and RTs perform functions which MATs do not, for example, at the Butler VA only RTs can do patient initial patient assessments, a MAT is not qualified to supervise an RT. See Defendant's Reply Brief, p. 2. Yet, Plaintiff testified at his deposition that prior to the merger MATs did complete initial patient assessments, see Plaintiff's deposition, p. 23, and Kunst testified at his deposition that at some point after the merger, the issue of whether MATs could perform initial patient assessment was raised and he, Plaintiff and Sumansky were told by the Joint Commission that MATs could perform initial assessments and that they didn't have to be done by a certified recreation therapist. See Kunst deposition, pp. 113-114.  Additionally, while Plaintiff had not supervised the requisite number of MATs for a number of years, it was not until Zeiler appeared on the scene, a female who under Plaintiff's version of the facts favored the female RTs over the male MATs, that Plaintiff's status as Supervisory MAT was examined.  Accordingly,  Defendant's motion for summary judgment on Plaintiff's gender discrimination claim is denied.

18

**B. Plaintiff's retaliation claim**.

Defendant also contends that "[w]ith regard to Miklos' claim of retaliation, he cannot meet his *prima facie* case because he cannot establish an adverse employment action, and, again, the VA has a legitimate, nondiscriminatory reason for its actions." Supporting Brief, pp. 1-2. "To establish a *prima facie* case of retaliation, a plaintiff must show that: (1) he or she engaged in a protected employee activity; (2) the employer took an adverse employment action after or contemporaneous with the protected activity; and (3) a causal link exists between the protected activity and the adverse action." Weston v. Pennsylvania, 251 F.3d 420, 430 (3d Cir. 2001) (citations omitted).

In his Opposition Brief, Plaintiff articulates the actions allegedly taken by Defendant which constitute the adverse employment actions underlying his retaliation claim. See Plaintiff's Opposition Brief, pp. 28-29, 31-32. First, Plaintiff argues that "immediately after Plaintiff filed his second EEO complaint, Plaintiff, and only Plaintiff, was assigned to work an additional group when he already had the most burdensome schedule in recreation therapy." Plaintiff's Opposition Brief, p. 28. Second, Plaintiff contends that "Defendant also stripped MAT duties from the Plaintiff. Following Plaintiff's demotion and the filing of his first EEO complaint, Ms. Taylor and/or Ms. Zeiler decided to terminate the woodworking and ceramics clinics that had been among the most popular programs performed by the MATs for a number of years, and threatened to terminate a number of other programs, such as arts and crafts and the green house." Id. at pp. 28-29. Finally, Plaintiff argues that Ms. Taylor harassed him and that these acts of harassment, when taken as a whole, were objectively severe and pervasive enough to alter a condition of Plaintiff's employment such that they together constitute an adverse employment action:

[s]pecifically, Ms. Taylor frequently referred to Plaintiff in writings using the feminine version of his name, "Terri;" She has written several false reports of contact which accused Plaintiff of not performing his work or not being present at his assigned work area; She has failed to respond to his e-mails on numerous occasions and has refused to meet with him; She often orders supplies late or not at all for Plaintiff's activities, which causes a great deal of embarrassment when the volunteer groups arrive for the activities for which the supplies were needed; She and Ms. Capuzzi frequently canceled Plaintiff's programs when he was off rather then covering them and then would receive awards for covering the activities when they actually did not; She has frequently failed to pass on information to Plaintiff that is important for the performance of his duties, such as patient diet restrictions; She frequently changes Plaintiff's group schedules over his objections, making his schedule more erratic than other employees in recreation therapy; She told Plaintiff on multiple occasions that he wasn't qualified to perform certain tasks, such as serving food, and then assigned volunteers to perform these tasks; She wouldn't allow Plaintiff to contact volunteer groups concerning MAT programs, and finally; she refused to trade days off with Plaintiff although she expected him to do so for her.

Plaintiff's Opposition Brief, pp. 31-32 (citations to record omitted).

## 1. Whether the instances of alleged retaliation discussed in Plaintiff's Opposition Brief were alleged in Plaintiff's Amended Complaint.

In arguing that summary judgment should be granted as to Plaintiff's retaliation claim, Defendant initially contends that "none of these [the three types or instances of retaliation discussed in Plaintiff's Opposition Brief] appear in the Amended Complaint. Consequently, and as this Court has reminded Miklos in the past, these allegations are not part of the instant lawsuit and therefore cannot defeat the VA's well-supported motion for summary judgment." Memorandum of Law in Reply to Plaintiff's Response to Defendant's Motion for Summary Judgment ("Defendant's Reply Brief"), p. 8 (citation omitted).

Paragraph 9 of Plaintiff's Amended Complaint alleges:

Beginning in July, 2000 and continuing through the present, the Defendant, acting through its agents, servants and employees, has retaliated against Plaintiff through one or more of the following acts:

(a) Defendant, acting through its agents and employees, has unjustly reprimanded Plaintiff on several occasion[s] for matters for which other employees were not subjected to any disciplinary action;

(b) Plaintiff has been excluded from meetings which other similarly situated employees have been permitted to attend;

(c) [a] position which Plaintiff applied for in September, 2000, was canceled to prevent Plaintiff from being promoted to this position; and

(d) [b]eginning on August 4, 2000, Plaintiff's supervisor, who was then the subject, in part, of Plaintiff's initial charge of discrimination, assigned her husband to work in Plaintiff's work area. Plaintiff's supervisor's husband thereafter subjected Plaintiff to verbal abuse and harassment.

Amended Complaint, ¶ 9 (a) - (d). Therefore, only evidence related to these allegations are relevant to Plaintiff's retaliation claim and will be considered in deciding Defendant's motion for summary judgment on Plaintiff's retaliation claim.

Turning to the events listed by Plaintiff in his Opposition Brief as evidence of how Defendant retaliated against him, we find that the following allegations were not part of Plaintiff's Amended Complaint and therefore will not be considered in analyzing Defendant's motion for summary judgment on Plaintiff's retaliation claim: (1) that "immediately after Plaintiff filed his second EEO complaint, Plaintiff, and only Plaintiff, was assigned to work an additional group when he already had the most burdensome schedule in recreation therapy; " (2) that "Defendant also stripped MAT duties from the Plaintiff. [in that f]ollowing Plaintiff's demotion and the filing of his first EEO complaint, Ms. Taylor and/or Ms. Zeiler decided to terminate the woodworking and ceramics clinics that had been among the most popular programs performed by the MATs for a number of years, and threatened to terminate a number of other programs, such as arts and crafts and the green house;" (3) that "Ms. Taylor frequently referred to Plaintiff in writings using the feminine version of his name, "Terri;" (4) that Taylor "has failed to

21

respond to his e-mails on numerous occasions and has refused to meet with him;" (5) that Taylor

"often orders supplies late or not at all for Plaintiff's activities, which causes a great deal of

embarrassment when the volunteer groups arrive for the activities for which the supplies were

needed;" (6) that Taylor and Capuzzi "frequently canceled Plaintiff's programs when he was off

rather then covering them and then would receive awards for covering the activities when they

actually did not;" (7) that Taylor "has frequently failed to pass on information to Plaintiff that is

important for the performance of his duties, such as patient diet restrictions;" (8) that Taylor

"frequently changes Plaintiff's group schedules over his objections, making his schedule more

erratic than other employees in recreation therapy;" (9) that Taylor "told Plaintiff on multiple

occasions that he wasn't qualified to perform certain tasks, such as serving food, and then

assigned volunteers to perform these tasks;" (10) that Taylor "wouldn't allow Plaintiff to contact

volunteer groups concerning MAT programs," and (11) that Taylor "refused to trade days off

with Plaintiff although she expected him to do so for her." Plaintiff's Opposition Brief, pp. 31-

32. Certainly Plaintiff's counsel, an experienced litigator, should know better than to include at

this stage in the proceedings new allegations. It is conduct such as this that slows down the pace

in which this Court can adjudicate the cases on its docket.

To the extent, however, that there is evidence of record which viewed in a light most

favorable to Plaintiff shows that Taylor "has written several false reports of contact which

accused Plaintiff of not performing his work or not being present at his assigned work area," then

such evidence is relevant to Plaintiff's allegation in his Amended Complaint that "Defendant,

acting through its agents and employees, has unjustly reprimanded Plaintiff on several

occasion[s] for matters for which other employees were not subjected to any disciplinary action."

Amended Complaint, ¶ 9(a).

**2. Whether the reports of contact constitute an adverse employment action.**

Concerning the reports of contact issued by Taylor against Plaintiff, Plaintiff cites to

pages 77-80 and 222 of his deposition. Contained within these pages is the following testimony:

Q. You also said that [Taylor] fabricated comments about you. Could you tell me
about that.

A. The report of contacts.  One was I wasn't doing my job on 3 East and I wasn't
there at certain times or something to that effect, but the nurses all liked me up
there and thought I did a good job.

Q. Do you know when this was?

A. Oh boy. Not offhand. It's in my documentation, though.

Q. Refresh my recollection about the report of contact procedure.
If I understand it correctly, a report of contact is actually a form; is that right?

A. Yes.


Q. So you're saying that [Taylor] filled out a form out about you called a report of contact
form?

A. Yes.

Q. What happened with that form when it's filled out?

A. It's given to whoever you want to give it to or kept for your own file.

Q. Is it always given to the person about whom it's written?

A. No.

Q. Were you ever admonished in any way as a result of this report of contact?

A. Not that I'm aware of at this time.

Q. Any other reports of contact that [Taylor] wrote about you that you recall as you're
sitting here today?

A. There were others, yes, that you submitted. You should have those.

23

Q. But I'm just asking for your recollection. Do you recall any others other than –

A. None other than the ones you gave me.

Q. Could we talk about those?

. . .

Q.  . . . Do you recall any of them as we sit here today?

A. Yeah. Yeah, they're in there.

Q. Could you tell me about those events?

A. They're all fabricated.

Q. So any report of contact written by Barb Taylor about you –

A. And Mary Ann Capuzzi was on – her name was on there, too.

Q. Okay.

A. They were trying to blackball. Okay? They were making up this stuff and making me look bad.

Q. So just so I'm clear, any report of contact written by [Taylor] and/or [Capuzzi], everything would be fabricated that's within there?

A. The ones that I reviewed that you sent me were.

Q. Do you know of any report of contact that they wrote that was not inaccurate or fabricated?

A. No.

Q. Do you recall any specifics about any report of contact written by [Taylor] about you other than this one we've talked about?

A. Not at this time.

Q. Okay.

A. There's others there, but I don't recall them offhand.

Plaintiff's deposition, pp. 78-80.

Additionally, Exhibit 8 of Plaintiff's Opposition Brief contains an e-mail from Taylor dated July 5, 2002 at 3:04 pm and at 4:21 pm. On July 5, 2002, Taylor was acting as, at Sumansky's direction, the "acting supervisor" of the Recreation Therapy group. The 3:04 pm part of the e-mail states: "Darlene Hall called at 2:55 from 3 East to say there was no Recreation Therapy Intervention being done that was scheduled at 2:30pm.   . . . I attempted to locate T. Miklos, as he was scheduled to do the 2:30 program. I could not find him anywhere. I was scheduled to do a 3pm program on 2 East, so I could not assist. As Acting Supervisor, I would have had him go to the unit, but since I could not find him, I was able to do nothing." The 4:21 pm part of the e-mail states: "I did meet up with Terry at 3:05. He was walking around 2 East. ?? I told him to go upstairs because the staff was looking for him."

Finally, the record also contains a report of contact dated February 25, 2002. Exhibit 8 attached to Plaintiff's Opposition Brief. The form itself has printed on it "[t]his form must be filled out in ink or on the typewriter as it becomes a permanent record in veteran's folders." The Report indicates that it was sent to the "Recreation Therapy Supervisor" by Taylor, the "contact" was "personal" and by "telephone" and states:

> [o]n Monday, February 25, 2002, I was on Unit 2 East for my afternoon ceramics group. I had to leave the unit to retrieve additional supplies for a patient in the group. As I was leaving the unit, Terry Miklos walked by, heading toward the elevator. I noted that he was scheduled to be on unit 3 East from 2:30-3:30 pm doing a patient activity. As I returned to my own group, and had the activity under control, I called him at his office number in Bldg. 2. He answered the telephone at about 3:20 pm.
>
> The staff on 3 East are continually voicing concerns that there are not enough activities for their patients. While there are enough activities planned on the schedule, if the assigned staff are busy checking up on other areas, the planned activities are not being done.
>
> I have also noticed Mr. Miklos leaving early on several occasions. Most noticeably was on Tuesday, 1-29-02 at 4:05 pm. This was witnessed by Anita

Lagrelius as well as myself.

Id.

Even viewing said evidence in a light most favorable to Plaintiff, this testimony does not constitute sufficient evidence upon which to support a claim for retaliation because these reports of contact do not rise to the level of being an adverse employment action. As stated in <u>Weston v. Commonwealth of Pennsylvania</u>, 251 F.3d 420 (3d Cir. 2001):

> Title VII specifically prohibits actions which would 'deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee.' The Supreme Court has defined a tangible, adverse employment action as a 'significant change in employment status, such as hiring, firing, failing to promote, reassignment, or a decision causing a significant change in benefits'. In the context of this case, [Plaintiff] must show . . . that these written reprimands affected the terms or conditions of his employment.

Id. at 430-31. Here, Plaintiff has failed to establish how the written reports of contact, even assuming they made a permanent part of Plaintiff's employee record (which is not clear on the record) effected any sort of material change in the terms or conditions of his employment. Indeed, Plaintiff has not produced any evidence that he was reprimanded as a result of these reports. To the contrary, with respect to one of the reports of contact submitted by Taylor, Plaintiff testified in his deposition, in response to the question "[1w]ere you ever admonished in any way as a result of this report of contact?," "[n]ot that I'm aware of at this time. See Plaintiff's deposition, p. 79. Accordingly, Defendant's motion for summary judgment on Plaintiff's retaliation claim is granted.

**IV. Conclusion.**

For the reasons stated above, the Defendant's motion for summary judgment is denied as to Count II of Plaintiff's Amended Complaint (his gender discrimination claim) and granted as to

Count I of Plaintiff's Amended Complaint (his retaliation claim). An appropriate order follows:

## ORDER

AND NOW, this 1st day of February, 2006, it is HEREBY ORDERED, ADJUDGED and DECREED that Defendant's motion for summary judgment is DENIED as to Count II of Plaintiff's Amended Complaint (his gender discrimination claim) and is GRANTED as to Count I of Plaintiff's Amended Complaint (his retaliation claim).

It is further ORDERED, ADJUDGED and DECREED that the Clerk of Court shall enter judgment in favor of Defendant and against Plaintiff as to Count I of Plaintiff's Amended Complaint.

It is further ORDERED, ADJUDGED and DECREED that the parties shall appear before this Court on February 14th , 2006 at 10:00 am for a settlement conference. Counsel shall attend in person and have settlement authority.  If this matter is not settled, then:

(1) Plaintiff shall file his pre-trial statement on or before February 24, 2006;

(2) Defendant shall file his pre-trial statement on or before March 10, 2006; and

(3) a pre-trial conference will be held in this matter on April 3, 2006 at 10:00 A.M..

Counsel shall attend in person and have settlement authority.

S/Maurice B. Cohill, Jr.
Maurice B. Cohill, Jr.
Senior District Judge